RECEIVED

OCT 3 0 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CALVIN ENGLISH

versus

WARDEN, LOUISIANA STATE
PENITENTIARY

CIVIL ACTION NO. 05-1172-P

JUDGE HICKS

MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Calvin English ("Petitioner") and his brother, Cedric, were charged with the armed robbery of a motel owner. Cedric pled guilty to armed robbery, and Petitioner went to trial. Petitioner did not testify, but Cedric testified for the defense that he had forced Petitioner to participate in the robbery.

A Caddo Parish jury convicted Petitioner, who was later adjudicated a second felony offender and sentenced to 49-1/2 years in prison. The conviction and sentence were affirmed on direct appeal. State v. English, 774 So.2d 1186 (La. App. 2d Cir. 2000), writ denied, 799 S.2d 499 (La. 2001). Petitioner also pursued post-conviction relief in the state courts. He now presents a federal petition for habeas corpus relief that lists two issues: (1) denial of an impartial jury because of the presence of juror Bailey and (2) ineffective assistance of counsel based on the presentation of an unsupported theory of defense. Also included within the arguments on those listed issues are contentions that counsel was ineffective for failing to challenge or strike juror Bailey and that counsel did not communicate a pre-trial plea offer

that would have resulted in a 10-year sentence with no multiple offender enhancement. It is recommended, for the reasons that follow, that the petition be denied.

**Trial Testimony**

The sufficiency of the evidence is not at issue, and Petitioner does not challenge the accuracy of the state appellate court's description of the trial testimony. In fact, Petitioner's brief to this court adopts in large part the appellate court's recitation of the facts. Accordingly, the undersigned will also borrow generously from the facts set forth in the state court's decision.

Mack Poindexter lived in a home adjoining the Hosston Motel, which he owned and operated, on Highway 71 in Hosston, Louisiana. Mr. Poindexter awoke about 6:00 a.m. one morning and saw two black males standing beside the motel. He said that he "didn't think too much about it" and went back to bed. Mr. Poindexter again awoke at about 8:00 a.m. and saw Petitioner and his brother, Cedric, sitting at the foot of the stairway outside. Mr. Poindexter told the men that they would have to sit somewhere else, and the men moved to sit at a nearby picnic table while Mr. Poindexter went back into his home.

Cedric soon appeared at Mr. Poindexter's back door requesting to rent a room. Poindexter declined when Cedric could not provide any identification. Later, Cedric returned alone to the front door and told Mr. Poindexter that he had found an old ID. While Petitioner stood outside on the edge of the porch, Cedric went into the motel office and Mr. Poindexter

shut the door. When Mr. Poindexter asked Cedric for the ID, Cedric drew a revolver from his pants and pointed it at Mr. Poindexter. Cedric then demanded Poindexter's car keys.

Mr. Poindexter gave the car keys to Cedric. He stated that Cedric then said something that he did not understand, and Petitioner came into the building through the side door and into the office. Mr. Poindexter said that Petitioner did not appear to be frightened or surprised when he came into the office and saw his brother pointing a gun at Mr. Poindexter. He further testified that Petitioner never said a word during the entire encounter. Cedric handed Mr. Poindexter's car keys to Petitioner and told him to start the car. Meanwhile, Cedric demanded money from Mr. Poindexter, who told him that the money was in a book in the drawer. Cedric reached into the drawer and retrieved the book. At this time, Petitioner came back into the motel office and took the book. As Petitioner rifled through the book, the money fell out onto the floor. Throughout this encounter, Cedric kept the gun pointed at Mr. Poindexter, who never heard Petitioner protest what was happening.

After the two men had the money, Cedric pulled out a chair, placed Mr. Poindexter in it and told Petitioner to tie him up. Petitioner tore the phone cord from the wall and tied Poindexter's arms together and then to the chair. He used a sheet to tie Mr. Poindexter's legs to the chair. Mr. Poindexter testified that during this ordeal, Cedric threatened to shoot him. He also threatened to shoot Petitioner as Petitioner tied up Mr. Poindexter because he was moving too slowly. Mr. Poindexter said that he did not notice whether Petitioner was frightened by this remark.

After Petitioner tied up Mr. Poindexter, Cedric sent Petitioner outside to warm up Mr. Poindexter's car. After Petitioner got into the car, he either honked the horn or made a gesture to Cedric to hurry up. Petitioner, driving the car, took off from the motel; Mr. Poindexter said that the car was "spinning."

Mr. Poindexter freed himself from the chair and called 911. Caddo Parish Deputy James Alexander spotted the car speeding south on Highway 71 toward Shreveport. Deputy Alexander, another deputy, and officers from the Shreveport Police Department (SPD), chased the English brothers south on Highway 71 at speeds over 100 miles per hour. Defendant lost control of the car at the highway's intersection with Old Mooringsport Road and ran into a ditch. Police found a partially loaded revolver on the front passenger seat of the car.

Petitioner and Cedric ran through the nearby woods, but Officer Kevin Perry apprehended them behind a house. Petitioner told Perry that "he was just walking from his aunt's house." Perry testified that the men did not seem to be arguing with one another, and were simply "standing there watching the policemen's actions." Petitioner did not ask Officer Perry for help or say that he was in danger from Cedric.

CPSO Sergeant Rodger Page transported Petitioner to the Sheriff's office. Sgt. Page testified that Petitioner made only two unprompted statements: First, Petitioner asked the whereabouts of his brother, and second, upon observing their direction of travel, he stated: "This isn't the way to Caddo." Sgt. Page testified that Petitioner was very calm when he

asked about his brother and that he never asked to be kept separated from Cedric or expressed that he might be in danger from his brother.

CPSO investigator Charles Bradford interviewed both Petitioner and Cedric. Tapes of these interviews were played before the jury. The tape of Petitioner's interview was presented in the state's case-in-chief; the tape of Cedric's interview was played in rebuttal to respond to Cedric's testimony that he forced Petitioner to participate in the crime.

Petitioner told Bradford, during the interview, that he and his brother had gone to Hosston in a vehicle driven by an acquaintance after going to a club in Rodessa. The acquaintance did not follow through on a promise to return and pick up the men, leaving them stranded in Hosston all night. Petitioner told the investigator that he did not see Cedric threaten Mr. Poindexter with a gun. He said that he thought Mr. Poindexter gave Cedric the keys to his car when Cedric asked for them because the innkeeper was a "drughead" or "dopehead" and had rented the car to Cedric for "a piece or some money or something." Petitioner initially stated that he did not know that his brother had a gun, and he flatly denied that he tied up Mr. Poindexter or that he took any money from the innkeeper. But he soon admitted that he had seen his brother with a gun the night before the robbery. He also denied that he or his brother had any money on them, but then he stated that his brother did have money that morning to pay for the room. Petitioner said that Cedric did not tell him that he had "jacked" the car until the two men were driving toward home in the car. Petitioner said that he did not stop for the pursuing officers because he thought that the police wanted to

stop the car in front of him. He said that when he realized that the officers were pursuing him, he stopped the car, and he and Cedric got out and ran.

Petitioner's fingerprints were found on the book that had contained Mr. Poindexter's money. Police also found a telephone cord with one broken connector and a white sheet in the room where Mr. Poindexter said he was tied up.

Cedric, who had earlier pled guilty to the robbery (and who would later receive an eight-year sentence), was the only witness called by the defense. Regarding defendant's participation in the crime, Cedric testified that Petitioner, "he [sic] ain't know nothing about it, you know. He [sic] sitting out there probably still sleeping, and I'm not paying him no attention at all because I'm-I'm trying to-just trying to get out of this predicament I was in. He comes up, knocks on the door. I just said, 'Come on in.' He turned around and looked around the door. He didn't see me at first. And I said, 'Come on in.' He comes in, you know, and I just drawed the pistol on him, too. 'Say, man, why don't you just-just go over there, stand right there.' 'Man, what you [sic] doing?' I'm like, 'Man, just go stand over there. Just go stand over there.' He looked me up and down. I said, 'Just go stand over there.' Looked like he was real surprised. And I don't know what was wrong, but I just told him-just draw [sic] the pistol on him too." Cedric added that he forced Petitioner to tie up Mr. Poindexter with the telephone cord and bed sheet. Cedric said that he wasn't in his "right mind" when he made the statement to Investigator Bradford. Petitioner did not testify.

The state put on rebuttal evidence by playing the tape of Cedric's interview with Investigator Bradford. Cedric told Bradford that the men arrived in Hosston with one of Petitioner's friends at about 8:00 p.m. on the night before the robbery. Cedric said that when the two went to a club, he found a gun lying in the street. Cedric said that another club patron had dropped the gun on the ground when police arrived at the club. Around 2:00 a.m., after failing to find a ride home to Shreveport, the men got a ride to the Hosston Hotel, but it was closed. They waited on the hotel premises until it opened in the morning so they could get a room. Cedric said that he became angry with Mr. Poindexter because the innkeeper asked for identification before renting the men a room. Cedric said that he was also angry about being stuck in Hosston and decided to pull the gun. He explained: "He [Mr. Poindexter] cooperated, you know what I'm saying. He was [sic] telling me why did it have to be him. I asked him why did it have to be me that drive [sic] in (inaudible) up here and drop me off over here at your motel and don't come [sic] picking me up···· You know what I'm saying? I ain't gonna do nobody [sic] like that." Cedric also had this exchange with Investigator Bradford:

Q: [Petitioner] knew what was going on all along, right? He knew what was going down?

A: When he walked in, he knew.

Q: Okay. He-what-

A: I had told [sic] him before I walked in, I said man, I'm (inaudible) I'm mad, I'm sleepy, I want to go home, I don't like this shit, you know what I'm saying.

> We can get shit, man, you know what I'm saying. Man, I can't take this no
> more.

Cedric told the investigator that Petitioner tied up Mr. Poindexter and that he told his brother "don't hurt the old man." The jury returned a verdict of guilty as charged by a vote of 10 to 2.

**Timeliness**

Petitioner's direct appeal process ended when the Supreme Court of Louisiana denied a writ application on October 6, 2001. Petitioner did not file a petition for certiorari to the United States Supreme Court, so his conviction became final for purposes of determining the commencement date for the one-year habeas limitations period 90 days after the state's highest court denied his application for discretionary review. Flanagan v. Johnson, 154 F.3d 196, 197 (5th Cir. 1998). Accordingly, the limitations period commenced on January 4, 2002.

Petitioner tolled the limitation period pursuant to 28 U.S.C. § 2244(d)(2) when he filed a timely application for post-conviction relief in the state district court on August 12, 2002. Tr. 845. In the interim, 220 days had elapsed. Petitioner pursued that process through the Supreme Court of Louisiana, which denied an application for a writ on April 30, 2004. Tr. 1140. Petitioner did not file his federal habeas corpus petition until more than a year later, on June 30, 2005, so it is plainly untimely unless something happened between the Supreme Court of Louisiana's writ denial and the federal filing that would toll the limitations period.

The record before the court reflects only two events with the potential for tolling. The first is styled a "supplement brief" submitted to the Supreme Court of Louisiana. The supplement was signed by Petitioner on March 16, 2004, about two weeks before the Supreme Court of Louisiana denied the writ application, but it is marked as being received by the court on May 15, 2004, about two weeks after the writ denial. Tr. 1141-43. The short supplement merely made clear that an ineffective assistance claim was based on the failure to challenge or strike juror Bailey, and the supplement was plainly intended to go along with the application that was described in the supplement as "now pending" in the court. There is no indication that the Supreme Court of Louisiana has ever issued any written order with respect to this supplement, and there is no argument presented for treating the supplement to a now-denied application as having any tolling effect.

Petitioner also filed with the Supreme Court of Louisiana an entirely new application for a supervisory writ. The application was signed by Petitioner on May 20, 2004, about three weeks after the Supreme Court of Louisiana had denied the earlier application. (The clerk of court indicated that the pleading was postmarked May 21, 2004 and received soon afterward.) The new application merely repeated arguments made in the previously denied application. Tr. 1144. It was accompanied by a motion for leave to file an out-of-time writ application that did not make clear the reason for the second filing, but mentioned an attempt to properly exhaust claims in accordance with Baldwin v. Reese, 124 S.Ct. 1347 (2004). Tr. 1165-68. The clerk of court assigned the new application a new case number, as if it were a proceeding different from the one that gave rise to the previous writ denial. The action

apparently lingered in the court for almost a year. This order then issued: "Denied. Repetitive. cf. La. C. Cr. P. art. 930.4(D)." Tr. 1234. The referenced article is a general prohibition against a successive post-conviction application that fails to raise a new or different claim.

The State has squarely raised the timeliness defense, and there are a number of good reasons the late-filed submissions should not toll the limitations period. There is also a lack of certainty in the law as to how the purported tolling event in this case should be treated under jurisprudence such as Artuz v. Bennett, 121 S.Ct. 361 (2000), Pace v. DiGuglielmo, 125 S.Ct. 1807 (2005), Williams v. Cain, 217 F.3d 303 (5th Cir. 2000) and the many Fifth Circuit tolling-related decisions that have issued before and after those landmark decisions. Under the circumstances, where it is not clear whether the state court treated the submission as a request for rehearing, a new and untimely application for a supervisory writ or something else, and the court's decision did not rest on untimeliness, the better course is to proceed to address the merits but with an acknowledgment of this timeliness defense that must be addressed if an issue is found to have merit.

**Juror Bias**

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, provides for a right to a criminal trial by an "impartial jury." The Sixth Amendment also guarantees the right to counsel, whose performance must satisfy an objectively reasonable standard to satisfy the Constitution. Strickland v. Washington, 104 S.Ct. 2052 (1984). Petitioner has complained through his post-conviction proceedings that juror Steven Bailey

(who voted to convict as shown by the poll at Tr. 756-57) was not an impartial juror and that defense counsel, F. Edward Mouton, was ineffective because he did not challenge Bailey for cause or use a peremptory strike against him.

The voir dire process in Louisiana courts often resembles a combination of closing arguments and a people's law school and, as in this case, it often consumes as much time as the presentation of the evidence. Mr. Bailey was among the first twelve jurors called to the box for the voir dire process. The prosecutor first addressed the jurors and asked them a number of questions. Mr. Bailey volunteered that his neighbor was a deputy sheriff, but he said he would nonetheless be an impartial juror. Tr. 126. (Petitioner does not complain about this answer.) Mr. Berry, another member of the panel, described a products liability case in which he had been the plaintiff, and he asked questions and made comments based on his experience in that civil case. See, e.g., Tr. 221-25.[1] At the end of the prosecutor's voir dire, Mr. Berry asked whether the jury could ask questions of witnesses if the jury did not understand a situation. The judge responded that questions were prohibited. Tr. 257-58.

Defense counsel then spoke at length about issues including the defendant's right to put on no evidence, not take the stand, and put the state to its burden of proof. Tr. 258-63. He then asked Mr. Bailey if he could prove his innocence if he were charged with armed robbery, and Mr. Bailey said no. Tr. 263. Counsel continued to speak at length about

---

[1] Mr. Berry's civil case is reported at Berry v. Commercial Union Ins. Co., 565 So.2d 487 (La. App. 2d Cir.1990), writ denied, 569 So.2d 959 (La.)

burdens of proof, the "Perry Mason" television show, and circumstantial evidence (Tr. 263-68) before he asked another question of a prospective juror. This exchange then occurred:

> MR. MOUTON: But what if, what if, you never heard a word from the person charged with a crime that the State tells you can carry from five to nine-nine years. Could you believe that that person didn't do it?
>
> Mr. Bailey, for instance. The State makes its big case always with sound and fury to get the Defendant, and there's some question in your mind about what really happened. Of course, you can't ask any questions. But you don't hear anything from the Defendant.
>
> Will his failure to testify influence your decision in any way? And it's okay to be honest. There's no right or wrong answers here.
>
> MR. BAILEY: I don't know. I mean, I agree with the guy back here [presumably referring to Mr. Berry]. You don't know what kind of person he was. You don't know if he's trying – I mean, you don't know. If you can't ask a question, you can't – your hands are tied. You got to go with what you hear. Like you don't hear nothing from him, yeah, that would incriminate him with me.
>
> MR. MOUTON: Okay. Now, the Judge will instruct you in what we call the charge to the Jury that the Defendant's failure to testify can carry no weight with you one way or the other. He tells you that. And be honest, could you not hold that against him?
>
> MR. BAILEY: No, I couldn't say I wouldn't, I mean.

Tr. 268-69. Counsel then turned his attention to Mr. Berry, who said there was "no way" he could get past not hearing the defendant testify. Tr. 269-70. Ms. Smith then said she would wonder what the defendant was trying to hide if he did not testify. Tr. 271.

After counsel engaged in more discussion with Ms. Smith about the issue, Judge Bryson (a very experienced trial judge), paused the voir dire. He then spoke to the potential jurors at length and emphasized the difference between criminal and civil cases and stressed the burden on the state to prove guilt beyond a reasonable doubt and the accused's constitutional right to not testify at trial. He also explained that the jury could not "hold any presumption of guilt against a Defendant who does not want to come and to testify." Tr. 273-75. Judge Bryson then asked the panel if those rules seemed different than what they appreciated when they began the voir dire process. Mr. Berry asked for confirmation that the defense was under no obligation to put on a case. When that understanding was confirmed by the judge, Mr. Berry said: "See, I didn't – coming into this, I didn't have any idea of that. I thought both sides had to put their's on." Tr. 276. The voir dire continued. Mr. Bailey was never again questioned, but he raised no questions after the judge's explanation.

The prosecutor made a challenge for cause as to Mr. Berry because Berry had said he thought the jury should be allowed to sentence the defendant. Defense counsel first said that he believed Mr. Berry could be fair, but the judge reminded him that Mr. Berry did once say that he believed a defendant should testify. Defense counsel then said he would not object to the challenge. The judge accepted the challenge but remarked that he had "heard both sides of that by Mr. Berry, so I did not think there would be an objection." Defense counsel challenged Mr. Stewart, who had pleaded to be excused so he could tend to his business. Tr. 292-94. The exercise of peremptory challenges was not recorded on the transcript, but the

court reporter's index at Tr. 177 shows that some prospective jurors were "excused by the lawyers" and others were accepted. Mr. Bailey was accepted.

Petitioner first complained about juror Bailey in his post-conviction application. He listed as an issue the asserted violation of his right to trial by an impartial jury (Tr. 862), but he included a brief contention in his argument that the claim also supported a claim for ineffective assistance of counsel under Strickland. Tr. 865. The district court judge rejected the impartial jury claim because Petitioner did not give reasons for not raising the claim in the trial court or on direct appeal. See La. C. Cr. P. art. 930.4. The judge did not address the related Strickland argument (although he did address other Strickland claims). Tr. 894. Petitioner filed a writ application with the appellate court and argued that the district court had violated Article 930.4 by not giving Petitioner notice and opportunity to explain the failure to raise a claim at an earlier stage. He continued to press his impartial-jury and related Strickland claims. Tr. 896-915. The appellate court held that the trial court "did not err in denying the applicant's post-conviction relief claims." It added: "The applicant failed to show that a member of the jury was not impartial under La. C. Cr. P. art. 797 and he failed to show ineffective assistance of counsel under the Strickland [] 2-prong test." Tr. 1061. Petitioner pressed on to the Supreme Court of Louisiana. Tr. 1065. That court denied relief without comment. Tr. 1140.

There was no hearing held in the state court, and the state did not file an affidavit from defense counsel in which he could have perhaps explained why he did not challenge or strike Mr. Bailey. For all we know from the cold record, Mr. Bailey may have nodded

understanding of the judge's explanation or exhibited other unrecorded behavior that influenced counsel's actions. But the record presented to this court bears no explanation.

Federal relief is not available unless the state courts' adjudication of the impartial jury and Strickland claims resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). The Fifth Circuit recently reviewed a similar, but distinguishable, case in which defense counsel did not challenge two jurors who stated they could not be impartial. The first juror stated that, because of his relationship with law enforcement officers, he could not serve as an impartial juror. The second juror said he could not be impartial because his mother had been mugged and the unsolved crime weighed on his mind. Counsel did not attempt to clarify or rehabilitate the testimony, and the trial judge never expressed any concern regarding the jurors' statements. The Fifth Circuit held that when the jurors had "unequivocally expressed that they could not sit as fair and impartial jurors" and counsel did nothing, habeas relief was required pursuant to Strickland and Section 2254. Virgil v. Dretke, 446 F.3d 598 (5th Cir. 2006).

Mr. Bailey did not state that he would be impartial with the degree of certainty demonstrated by the jurors in Virgil. Rather, his last response on the issue was: "No, I couldn't say I wouldn't, I mean." The response suggests that Mr. Bailey thought he might hold Petitioner's silence against him even if instructed that the law was otherwise, but there was also some uncertainty or equivocation suggested by his answer. And unlike in Virgil, the trial judge *did* express concern regarding the statements by Mr. Bailey and other

prospective jurors about their understanding of Petitioner's right to not testify. After counsel encountered similar responses from other prospective jurors, Judge Bryson, an experienced trial judge with decades on the bench, recognized that there was confusion on the issue and took the time to explain at length the difference between criminal and civil cases, the burden on the government, the lack of burden on the accused, the right of the accused to not testify, and the requirement that the jury "cannot hold any presumption of guilt against a Defendant who does not want to come and to testify." Tr. 273-75. After the judge educated and instructed the jury on those issues, Mr. Berry, who had perhaps been the leader in sowing the earlier confusion, said he had been confused based on his prior experience in a civil case but now recognized the right of an accused to remain silent without penalty. Neither defense counsel nor the court specifically questioned Mr. Bailey as to whether he then correctly understood the law, but Mr. Bailey did not ask any questions after the judge explained the law.

The state court was not, under these circumstances, objectively unreasonable in rejecting the post-conviction claims based on alleged juror bias and related ineffective assistance of counsel. The record does not show express, specific rehabilitation of Mr. Bailey following his uncertain answer, but the record does show that the trial judge soon afterward carefully and at length explained to the jury what the law required of them if an accused did not testify. After considering the voir dire as a whole, the undersigned concludes that defense counsel's election to not challenge or strike Mr. Bailey cannot be said to fall below the minimum level of competence required by the Sixth Amendment and, moreover,

the state court cannot be deemed to have applied <u>Strickland</u> to this claim in an objectively unreasonable fashion. The claim of an impartial jury is similarly not a basis for federal habeas relief. Reasonable minds could perhaps differ (on the cold record) on whether counsel should have pursued the issue further in voir dire or challenged Mr. Bailey, but the potential for such disagreement is not sufficient to permit the federal court to vacate the state court conviction under the demanding and deferential standards of Section 2254(d).

**Ineffective Assistance of Counsel (Other Claims)**

Petitioner first complained of ineffective assistance of counsel (other than as addressed above) in his post-conviction application. He contended that counsel presented a "bogus theory" of defense that was not supported by the evidence that so strongly indicated guilt. Petitioner said counsel should have "at least attempted to secure a plea bargain for his client" rather than go to trial against such strong evidence. Petitioner repeated elsewhere in his application that counsel was ineffective because he "fail[ed] to suggest a plea bargain to the State on behalf of his client." Tr. 866-69.

The district judge rejected the claim because Petitioner failed to realize that a defense counsel "cannot force the state into a plea bargain." Also, Petitioner's allegations did not suggest grounds for prejudice under <u>Strickland</u>. Tr. 894-95.

Petitioner took a different approach in his writ application and alleged for the first time that he "was informed by counsel after trial, that a plea bargain was available." Petitioner asserted that counsel "withheld this information from petitioner and encouraged him to proceed to trial, alleging the State had no evidence that would result in his

conviction." Tr. 907. Petitioner also wrote that "it was revealed to petitioner by counsel, after being found guilty, that the State had offered a plea bargain of 10 years with no multiple bill." Tr. 914. The appellate court did not specifically address the allegation. Rather, it simply denied relief with a conclusion that Petitioner had failed to satisfy the two-prong Strickland test. Tr. 1061. Petitioner applied to the Supreme Court of Louisiana, adopting his earlier arguments, and that court denied relief without comment. Tr. 1140.

Petitioner complains that the defense strategy was not supported by evidence, but Petitioner's brother did testify in support of the claim. The jury apparently found Cedric's testimony not credible, but that does not automatically render counsel constitutionally deficient. Petitioner faults counsel for relying on Petitioner's brother to support a defense, but Petitioner has yet to articulate a viable alternative strategy that counsel should have pursued. The evidence that Petitioner participated in the robbery was overwhelming, and counsel could only attempt to explain a non-criminal reason for Petitioner's participation. He pursued the duress strategy, which failed, but his election to pursue that strategy does not provide a basis to find that the state court's rejection of this claim was an objectively unreasonable application of Strickland.

Petitioner's next claim relates to a possible plea bargain. He first faulted counsel for not attempting to obtain a plea offer. After the trial court rejected that argument, Petitioner asserted for the first time that counsel had received a plea offer but not communicated it to Petitioner until after the trial. Petitioner urges the latter version of events to this court.

"One of the most important duties of an attorney representing a criminal defendant is advising the defendant about whether he should plead guilty." U. S. v. Herrera, 412 F.3d 577, 580 (5th Cir. 2005). "In determining whether or not to plead guilty, the defendant should be made aware of the relevant circumstances and likely consequences so that he can make an intelligent choice." Teague v. Scott, 60 F.3d 1167, 1170 (5th Cir. 1995). For those reasons, the Fifth Circuit has agreed with several other courts that "the failure of trial counsel to inform the defendant about a government plea offer amounts to ineffective assistance of counsel." Id.

If counsel did not communicate an offer, that does not automatically entitle a petitioner to relief. Prejudice must be established. A constructive denial of counsel gives rise to a per se presumption of prejudice, but that occurs in only a "very narrow spectrum of cases" where counsel's ineffectiveness is so egregious that the defendant was in effect denied any meaningful assistance. U. S. v. Griffin, 324 F.3d 330, 364 (5th Cir. 2003). Constructive denial happens only when "counsel was not merely incompetent but inert, distinguishing shoddy representation from no representation at all." Id. "[B]ad lawyering, regardless of how bad, does not support the per se presumption of prejudice." Id.

This claim should be decided under the Strickland framework and its requirement of prejudice. If the per se presumption applied in these circumstances, counsel's mere failure to communicate any offer would require some form of habeas relief. There could easily be situations where counsel failed to communicate an offer and there is no actual prejudice

because, for example, the defendant learned of the offer from another source or the defendant would have rejected the offer.

The prejudice issue usually arises in connection with a trial error, and prejudice is said to exist only if there is a reasonable probability that, but for counsel's error, the result of the trial would have been different. Strickland, 104 S.Ct. at 2068. When a defendant claims that his attorney gave him bad advice that caused him to wrongfully enter a guilty plea, prejudice is shown if there is a reasonable probability that, were it not for counsel's errors, the defendant would not have pled guilty and would have proceeded to trial. Hill v. Lockhart, 106 S.Ct. 366 (1985). In this setting, it appears that the appropriate test for prejudice is whether there is a reasonable likelihood Petitioner would have accepted the 10-year plea offer if counsel had communicated it to him. See Teague, 60 F.3d at 1171-72 (petitioner's statement that he would have taken the plea offer into serious consideration had he been properly advised of his maximum sentence exposure was sufficient evidence of prejudice to require a hearing). See also Aeid v. Bennett, 296 F.3d 58, 60-63 (2d Cir. 2002) (citing cases that hold prejudice requires a reasonable probability that the defendant would have pled guilty if not for counsel's poor sentencing advice).

When an applicant has failed to develop the factual basis of a claim in the state court proceedings, the federal courts shall not hold an evidentiary hearing on the claim unless the applicant meets certain strict requirements, none of which have been shown to apply. 28 U.S.C. § 2254(e)(2). Before and after the enactment of that statute, federal courts have refused to hold an evidentiary hearing on a claim unless the petitioner alleged specific facts

that would entitle him to relief, as opposed to mere bold assertions on a critical issue that were unsupported by anything in the record. U.S. v. Edwards, 442 F.3d 258, 268 n. 10 (5th Cir. 2006); Johnson v. Scott, 68 F.3d 106, 112 (5th Cir.1995).

There is no direct allegation or any objective evidence that Petitioner would have accepted the alleged plea offer if counsel had communicated it to him. The absence of such precludes a finding of prejudice, so no hearing or other proceedings are required with respect to this claim. See Aeid, 296 F.3d at 64 (lack of assertion that plea would be accepted was a critical omission fatal to claim). Petitioner has had several opportunities and ample time to develop his allegations and the record on this issue, but he has failed to make the key assertions required to permit a finding of prejudice even if he could prove the failure of counsel to communicate a plea offer. No relief is warranted on this final claim.

Accordingly;

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and Plaintiff's Complaint be **dismissed with prejudice.**

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this the 30th day of October, 2006.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE

cc: Judge Hicks